## THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| ARMADILLO DISTRIBUTION ENTERPRISES, INC. D/B/A DEAN GUITARS; CONCORDIA INVESTMENT PARTNERS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> IN DIME WE TRUST, RLT; RITA SUE HANEY, <br><br> Defendants. | Case <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR MONEY DAMAGES AND DEMAND FOR A JURY TRIAL** |

## COMPLAINT

Plaintiffs, Armadillo Distribution Enterprises, Inc. d/b/a Dean Guitars ("Armadillo") and Concordia Investment Partners, LLC ("Concordia") (collectively, "Dean" and "Plaintiffs"), through their undersigned counsel, hereby file this Complaint against In Dime We Trust, RLT, ("IDWT") and Rita Sue Haney ("Haney") (collectively, "Defendants"), and state and allege as follows:

## PARTIES

1. Plaintiff Armadillo is a Florida corporation with a principal place of business at 4924 West Waters Avenue, Tampa, Florida 33634.

2.     Plaintiff Concordia is a Florida limited liability company with a principal place of business at 700 Spottis Woode Lane, Clearwater, Florida 33756.

3.     Defendant IDWT has alleged in another action that it is a Texas revocable limited trust, with its trustee having residences in Los Angeles County, California, and Tarrant County, Texas.

4.     Defendant Rita Haney has alleged in another action that she is the trustee of IDWT and has residences in Los Angeles County, California, and Tarrant County, Texas.

## NATURE OF THE ACTION

5.     Dean asserts claims for trademark and trade dress infringement, trademark and trade dress dilution, false designation of origin and unfair competition, under the Trademark Act of 1946, as amended (The Lanham Act, 15 U.S.C. § 1051 *et seq*.), and related state causes of action based on Defendants' use of Dean's federally registered trademarks as identified below in connection with Defendants' advertising, promoting, marketing, and selling retail merchandise online, in violation of Dean's rights in federally registered marks and common law marks for related goods and services, and a claim for breach of contract.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), as it arises under the trademark laws of the United States.  This Court also has subject matter jurisdiction

over the claims in this action that relate to trademark infringement, false designation of origin, and federal unfair competition pursuant to sections 34(a) and 39(a) of the Lanham Act and 15 U.S.C. §§ 1116(a) and 1121(a), as these claims arise under the laws of the United States.  The Court has supplemental jurisdiction over the claims in this Complaint which arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

7.     This Court has personal jurisdiction over Defendants. Defendants have purposely, continuously, and systematically conducted business in this district.

8.     For example, Defendants have a continuous, systematic, and substantial presence within this judicial district, including by selling and offering for sale products bearing/using the infringing marks in this judicial district and by committing acts of trademark infringement in this judicial district, including but not limited to advertising and marketing directly to consumers in this district, selling merchandise directly to consumers and/or retailers in this district, and selling infringing merchandise into the stream of commerce, knowing such products would be sold in this district. Defendants target and make sales directly to consumers in Florida and this District by advertising and making sales through their website and social media sites, and participating in music festivals and other shows and events

where Defendants sell merchandise. These acts of Defendants form a substantial part of the events or omissions giving rise to Dean's claim.

9. Additionally, and as detailed below, Dean and the Estate of "Dimebag" Darrell Abbott ("Dime") had an ongoing and mutually beneficial contractual relationship for over 15 years. Dean signed an endorsement agreement with Dime in 2004, and renewed and amended that agreement with Dime's Estate after his death. According to a complaint filed by IDWT and Haney,

> [Dean] entered into an endorsement agreement with [Dime] relating to [Dean's] use of the name and likeness of [Dime] in the production and sale of guitars and related equipment and products, which agreement was amended by an instrument dated October 9, 2008. On or about April 2014, after the death of [Dime], his estate reinstated and amended the endorsement agreement with Defendant (the "Reinstated Endorsement Agreement"). The Reinstated Endorsement Agreement was terminated on April 30, 2020. The Reinstatement Endorsement Agreement included a six month sell off period, which ended on October 30, 2020.

10. The 2014 Reinstated Endorsement Agreement provided that the Estate "shall not acquire any interest whatsoever in [Dean's] trade names or trademarks, nor any right, during the term thereof or thereafter to manufacture, distribute or sell Endorsed Product, utilizing any trade names or trademarks of or owned by the Company." The 2014 Reinstated Endorsement Agreement further provides that it "shall be governed by and construed in accordance with the law of the State of Florida applicable to contracts entered into and *wholly performed within the State of Florida* [and

4

that] any litigation arising out of this Agreement *shall be contested exclusively* in the courts in Hillsborough County, Florida" (emphasis added).

11. On information and belief, this lawsuit arises out of the 2014 Reinstated Endorsement Agreement and because this lawsuit includes federal claims under the Lanham Act, the exclusive jurisdiction for litigation of these claims is this district.

12. Defendants are also subject to personal jurisdiction in this Court because they filed an action in this Court on August 16, 2021, against Plaintiffs, styled *In Dime We Trust, RLT v. Armadillo Distribution Enterprises, Inc., et al.*, Case No. 8:21-cv-01967 (M.D. Florida), in which Defendants in this case allege *inter alia* breach of "the Endorsement Agreement" (ECF 1 at 20–21).

13. This Court also has diversity jurisdiction over this case under 28 U.S.C. § 1332, as Plaintiffs and Defendants are jurisdictionally diverse from one another, and on information and belief, the amount in controversy exceeds $75,000.

14. Venue is proper in this district under 28 U.S.C. § 1391, as a substantial portion of the events giving rise to this action took place in this judicial district.

## FACTUAL BACKGROUND

15. In 1976, Dean Zelinksy, a teenager living in Chicago, Illinois, founded Dean Guitars. Zelinksy began commercially producing guitars in 1977.

16. Through the past five decades, Dean's guitars have risen to prominence in the music industry and attracted some of rock music's most legendary guitarists, including Michael Schenker, Eric Peterson, Christian Martucci, John Connolly, Eddie Veliz, Leslie West, Michael Amott, and "Dimebag" Darrell Abbott.

17. In 1977, shortly after founding the company itself, Zelinksy created the "Dean ML," named for his friend Matthew Lynn, who had died of cancer. The Dean ML is among Dean's most notable and popular guitars.

18. The Dean ML had an unusual design for its time, but through the prominence of the legendary guitarists who have embraced the Dean ML, its look, feel, and sound have become nearly synonymous with rock music itself. Below is a photograph of a Dean ML guitar:



19. "Dimebag" Darrell Abbot was one of the legendary guitarists who embraced the Dean ML. In one interview, Dime recalled how "[a]s a kid, it was always my dream to be with Dean Guitars, you know, and to

play Dean Guitars, and to own one someday."  ("Dimebag talks about his lifelong love affair with Dean Guitars" - YouTube *available at* https://www.youtube.com/watch?v=YA0515t6oaU.)

20.    The story of how Dime finally owned his first Dean guitar is a legend in its own right.  As a 16-year old and after years of studying the Dean catalog and dreaming about owning a Dean guitar, Dime entered a guitar contest in Dallas where the prize was a Dean ML and won it.  Below is a photograph taken of Dime (middle) and his mother, Carolyn Abbott (left), with Dime holding the Dean ML after winning the contest:



21.    What Dime didn't know when he entered the contest was that right before the contest, his dad had saved up and bought him another Dean ML guitar.  As Dime recalled, "[h]e really had to go out of his way to afford that for me.  But I was dying to have one, and he fixed me up.  For that, I'll be forever grateful to him."  (https://gear-vault.com/dimebag-darrell-

dean-ml/).  Thus began Dime's lifelong love affair with Dean Guitars and the Dean ML.  Below is a photograph of a young Dime proudly showing the Dean ML guitar his dad bought him:



22.     Dime went on to become the lead guitarist for Pantera, a highly successful heavy-metal band from Arlington, Texas.  Dime's love affair with the Dean ML continued during that time.  The cover of Pantera's platinum album, *Cowboys from Hell*, released in June 1990, shows Dime wielding his trusty Dean ML "axe":



23.     After the release of *Cowboys from Hell*, Dime signed an endorsement deal with Dean and appeared in Dean ads in the early 1990s.

24.     In 1994, Dean Guitars changed hands, and its production of guitars dwindled.   During that time, Dime approached other guitar companies about making similar style guitars, but they could never replicate the look, feel, sound, and other unique aspects of the Dean ML.

25.     In 1997, Elliot Rubinson and Armadillo Enterprises purchased Dean.  Dean began its journey back to its former level of greatness with Rubinson as the leader of the new company.

26.     Around 2004, Dime's endorsement deal with another guitar manufacturer expired.  In November 2004, Dime and Dean formally reestablished their feelings of mutual admiration with a new endorsement deal.  Dime became an endorser of Dean at that time.  According to Dime, being back with Dean was "the greatest thing that happened to him in 25 years."  ("Dimebag talks about his lifelong love affair with Dean Guitars" - YouTube *available at* https://www.youtube.com/watch?v=YA0515t6oaU).

27.     The 2004 Endorsement Agreement provided for Dean's "use of the name and likeness of Darrell Abbott in the production and sale of guitars and related equipment and products."

28.     In connection with the contract, Dean planned to release a new line of guitars named the "Razorback" as a result of its renewed collaboration with Dime.

29.     Tragically, Dime was killed on stage during a performance in December 2004.  Dime's death occurred shortly before Dean introduced the Razorback guitars under the new endorsement contract with Dime.

30.     As if he were one of its own family members, Dean mourned the loss of Dime and posted a memorial tribute to him on its website.  The website tribute received so many visits that it had to be shut down temporarily.

31.     Despite Dime's tragic death, Dean carried on a mutually beneficial relationship with Dime's estate ("Dime's Estate" or "the Estate"). Dime's brother and Pantera drummer, Vincent Paul Abbot ("Vinnie Paul"), a rock legend in his own right, became administrator of the Estate after Dime's death.

32.     Dean and the Estate, under the control of Vinnie Paul, had an uninterrupted partnership for over 15 years.  After the 2004 agreement between Dean and Dime, Dean and Vinnie Paul signed an amended endorsement agreement in October 2008, and the 2014 Reinstated Endorsement Agreement in June 2014.

33.     Like the prior agreements, the 2014 Reinstated Endorsement Agreement provided Dean the exclusive right to use Dime's name and likeness in the production and sale of guitars and related equipment and products.  The 2014 Reinstated Endorsement Agreement provided that Dean would pay Vinnie Paul an annual base compensation, plus a percentage of royalties on any sales proceeds exceeding a minimum sales target per year, as well as other royalties for instances of Dime's photograph appearing on the cover of major music magazines with Dean guitars.  The term of the 2014 Reinstated Endorsement Agreement was three years, concluding in June 2017, with the option to renew for one year at a time.

34.     The 2014 Reinstated Endorsement Agreement included representation and warranty provisions guaranteeing that it would validity obligate Vinnie Paul, as the administrator of the Estate, and would be

enforceable according to its terms.  The 2014 Reinstated Endorsement Agreement further provides that no "competing rights with respect to endorsement of guitars and stringed musical instruments or products" had been granted.

35.    Under the explicit terms of the 2014 Reinstated Endorsement Agreement, Dean and Vinnie Paul "agree[d] they will take all necessary steps during the Contract Period and thereafter to protect the Dime Endorsement, the name 'Dime,' or any facsimile thereof . . . ."

36.    Like Dime, Vinnie Paul and Dean had a great relationship and renewed the endorsement agreement until Vinnie Paul's unfortunate death in June 2018.

37.    For example, when Dean and the Estate faced a lawsuit from a former associate of Dime's in 2017 (*Buddy Webster v. Dean Guitars*, Case No. 2:17-CV-3027 (C.D. Cal.)), Dean fought the lawsuit on behalf of both Dean and the Estate.  Dean took the primary role in fighting the lawsuit despite the endorsement agreement providing that the Estate could have been required to indemnify Dean in the circumstances.  Dean spent over $1,000,000 defending that lawsuit, despite having this claim for indemnification from the estate.  At the end of that "long-fought battle," Dean's now CEO, Evan Rubinson, posted the following on Facebook celebrating the triumph on behalf of Dean, the legacy of Dime, and Dime's Estate:



38. In addition to paying for the defense of that lawsuit, Dean loaned Dime's Estate $139,000, interest free, to help the Estate pay for the appeal.

39. After Vinnie Paul's death, Dime's long-time girlfriend Rita Haney took over Vinnie Paul's interest in Dime's Estate.

40.    Dime's Estate, now under the direction of Rita Haney (hereinafter "Dime's Estate – Haney"), has alleged that Dean's 2014 Reinstated Endorsement Agreement with Dime's Estate was set to terminate on April 30, 2020.

41.    Haney has not re-signed or attempted to formally renegotiate the endorsement agreement between Dean and Dime's Estate - Haney.

42.    Since taking over Dime's Estate, Haney has told Dean that she should be getting a higher percentage royalty than what is provided in the 2014 Reinstated Endorsement Agreement.  Haney has suggested paying her royalties that are even higher than the royalties Dean and Dime negotiated and agreed to when they originally reformed their partnership in 2004.

43.    Despite Haney's increasing demands, Dean has tried to maintain its long-standing partnership with Dime's Estate and previously amicable relationship with Haney.

44.    On or about June 28, 2021, Haney assured Dean that there would be no issues renewing the endorsement deal between Dime's Estate – Haney and Dean.

45.    However, on June 29, 2021, Dime's Estate – Haney sued Dean under the name of IDWT (*In Dime We Trust, RLT v. Armadillo Distribution Enterprises, d/b/a Dean Guitars et al,* Case No.  2:21-CV-5260 (C.D. Cal.)), alleging "unauthorized use of Abbott's name and likeness."  As stated above, on August 16, 2021, Dime's Estate – Haney filed another lawsuit

against Dean, this time in this Court (*In Dime We Trust, RLT v. Armadillo Distribution Enterprises, Inc., et al.*, Case No. 8:21-cv-01967 (M.D. Florida)).

46.     Despite Haney's increasing demands for additional compensation, the infringement of Dean's intellectual property rights as described below, and the two lawsuits filed against Dean, Dean has continued to make monthly installment payments, up to and including August 2021, of the annual base compensation under the 2014 Reinstated Endorsement Agreement.  Dime's Estate – Haney has continued to accept those monthly payments and has never requested that Dean stop making them.

### DEAN'S TRADEMARK AND TRADE DRESS RIGHTS

47.     Concordia owns common law and registered trademark rights in dozens of federally registered marks, including the following word, logo, and product configuration marks:

| Registration Number | Mark | Listed First Use |
|---|---|---|
| 3923015 | DEAN GUITARS | 1977 |
| 3925298 |  | 1977 |

| 3925297 |  | 1977 |
|---|---|---|
| 2797456 |  | Aug. 1994 |
| 3562989 |  | Jan. 01, 2005 |
| 2609816 |  | Dec. 31, 1977 |

| 3185157 |  | Dec. 31, 1977 |
|---|---|---|

48.     The marks above are referred to as the "Dean Marks" herein.

49.     The federal trademark registrations for the Dean Marks are valid, subsisting, and in full force and effect.

50.     Concordia's federal registrations of the Dean Marks provide benefits such as a statutory presumption of validity, ownership, and an exclusive right to use the registered mark.  The federal registration of the Dean Marks also serves as constructive notice of claims of ownership.

51.     Dean has continuously used Dean Marks in connection with its guitars and related products since at least as early as their listed dates of first use.

52.     Dean promotes and sells its products by using various configurations of the Dean Marks.  *E.g.,*

17



https://www.deanguitars.com/product?id=usamldimecbk

(showing Reg. Nos. 3925298, 3923015, 3925297, 2797456, 2609816, 3185157)



https://www.deanguitars.com/product?id=rzrdbcbknc

(showing Reg. Nos. 3925298, 3923015, 3925297, 2797456, 2609816, 3644934, 3562989)



https://online.fliphtml5.com/csylt/zmht/#p=2

(showing Reg. Nos. 2609816, 2797456, 3925297)

53.     The Dean Marks are inherently distinctive or have acquired distinctiveness when used in connection with Dean's goods and services.

54.     The unique shape of the guitar bodies, necks, and headstocks, covered by the Dean Marks have become immediately recognizable as indicative of Dean guitars, including the Dean ML that Dime loved and played for the majority of his musical career.

55.     Due to the continual use of the Dean Marks, the Dean Marks have come to indicate a single source of goods and services.  The Dean Marks have further come to indicate Dean as the single source of such quality goods and services.

20

56.     As a result of the long and exclusive use by Dean of its Dean Marks, the significant volume of sales under the Dean Marks, and the large amount of money spent or foregone for advertising and promotion of its goods and services, the Dean Marks have become, through widespread and favorable public acceptance and recognition, an exclusive asset of substantial value as a symbol of Dean, its quality goods and services, and its goodwill.

57.     Dean and its use of the Dean Marks are well-known and famous.

58.     In particular, as discussed above, musicians all over the world have come to recognize the Dean Marks to reliably indicate guitars with a unique look, feel, and sound made to the highest quality standards.

## DEFENDANTS' INFRINGING ACTIVITIES

59.     In Dime We Trust, RLT is a newly formed entity founded by Rita Haney after she took over Dime's Estate.

60.     Defendants own and operate a website found at https://dimebaghardware.com/.  The website purports to be the "Dimebag Darrell Official Store."

61.     The "Dimebag Darrell Official Store" website shows Dime holding a Dean ML guitar on the main page:



62.     Defendants use the "Dimebag Darrell Official Store" website to sell merchandise that prominently features several aspects of Dean's unique product configurations and trademarks.

63.     For example, the "Dimebag Darrell - CFH Flames" and the "Dimebag Darrel – Logo" t-shirts advertised and sold through the website show the body and headstock of the Dean ML guitar that are covered by registration numbers 3925297, 2797456, and 3185157.





64.     Similarly, the "Dimebag Darrell – Designed by Charlie Benante" t-shirt advertised and sold through the website shows the body and headstock of the Dean ML guitar that are covered by registration numbers 3925297, 2797456, and 3185157, and shows a derivative of registration number 2609816.



65.     As another example, the "Dimebag Darrell – Dean from Hell" t-shirts advertised and sold through the website prominently feature the body of the Dean ML guitar and show the headstock that are covered by registration numbers 3925297, 2797456, and 3185157 and falsely associate with the DEAN name covered by registration number 3923015.



66. As another example, the "Dimebag Darrell Original Dime Stage Shirt" advertised and sold through the website shows the body and headstock of the Dean ML guitar that are covered by registration numbers 3925297, 2797456, and 3185157, the dean logos covered by 2609816, 3925298, and 2609816, and displays the DEAN GUITAR mark covered by 3923015.



67.    Additionally, the "Dimebag Darrell Trendkill Pick Tin Set" advertised and sold through the website shows the body and headstock of the Dean ML guitar that are covered by registration numbers 3925297, 2797456, and 3185157.



68.    Additionally, the "Dimebag Darrell Official Store" website falsely associates itself with Dean through the use of the DEAN name.



69.     Defendants promote the "Dimebag Darrell Official Store" website through social media websites such a Facebook and Instagram. Defendants' social media sites contain similar infringing uses of the Dean Marks.

70.     Haney has acknowledged that "Dimebag Darrell Official Store" website sells merchandise with the Dean Marks.

71.     Dean has not authorized Defendants to use the Dean Marks.

72.     Defendants' use of the Dean Marks is ongoing, and Defendants continue to use the Dean Marks in their advertising, marketing, and sales.

73.     Defendants' willful and unauthorized use of the Dean Marks in connection with their advertising, marketing, and sales is likely to cause confusion as to the source of their goods because the parties are using identical marks in commerce to advertise and market their goods.

74.     Defendants have harmed and will continue to harm Dean through their unauthorized use of the Dean Marks.  By and through this action, Dean is entitled to impoundment and destruction of infringing articles, an injunction against further infringement, three times the profits made by Defendants through such use (or three times Dean's damages, whichever is greater), all actual damages sustained by Dean as a result of such use, reasonable royalties for such use, punitive damages, attorneys' fees, and costs.

## FIRST CLAIM FOR RELIEF

(Federal Trademark and Trade Dress Infringement)

(15 U.S.C. § 1114)

75.     Dean repeats the allegations of paragraphs 1 through 74 above as if fully set forth herein.

76.     Dean has registered the Dean Marks with the USPTO and has the exclusive right to use this mark in connection with its guitars and related equipment and products.  Dean also has common law rights in the Dean Marks in connection with its guitars and related equipment and products.

77.     Dean has spent significant time, money, and effort advertising and promoting its trademarks in commerce as distinctive source identifiers in connection with Dean's goods.

78.     As a result of such extensive and exclusive use and promotion, The Dean Marks for product design have acquired distinctiveness due to the continued popularity and prevalence of the unique shapes used in Dean guitars.  The Dean Marks have developed a distinctive meaning as an indicator that Dean is the source of the goods identified by the Dean Marks.

79.     The product designs covered by the Dean Marks have no practical function.

80.     The Dean Marks represent valuable goodwill owned by Dean.

81.     Defendants' use of the Dean Marks is without Dean's consent.

82.     Defendants' unauthorized and infringing use of the Dean Marks in connection with Defendants' advertisement, promotion, offers for

sale, and sales of its merchandise through their website and social media constitutes use of the Dean Marks mark in commerce.

83.     Defendants use the Dean Marks to confuse and deceive the public into believing that Defendants and their merchandise are sponsored, affiliated or associated with Dean, when, in fact, they are not.

84.     Defendants' unauthorized use of the Dean Marks is likely to cause confusion, mistake, and deception as to the source of the products, and Defendants are unfairly benefitting from Dean's substantial efforts in advertising and promoting its Dean Marks.

85.     Due to Defendants' unauthorized use of the Dean Marks, Dean has suffered and continues to suffer great and irreparable injury, for which Dean has no adequate remedy at law.

86.     Defendants' actions constitute willful infringement of the Dean Marks in violation of 15 U.S.C. § 1114(1).

87.     Defendants' conduct has been willful and in bad faith making this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

88.     Defendants' use of the Dean Marks constitutes a violation of Dean's rights in its register marks, and Dean is entitled to an injunction prohibiting such further use.

89.     Defendants' acts have caused Dean damages, and Dean seeks judgment pursuant to 15 U.S.C. § 1117 for Defendants' profits made by Defendants through their unlawful acts, for the damages sustained by Dean,

and for all costs necessary to remediate the unlawful acts and their effects, pursuant to 15 U.S.C. §§ 1116 and 1117.

90.    Defendants willfully intended to trade on the recognition of Dean's famous marks, entitling Dean to treble its damages and Defendants' profits, increased subject to the principles of equity pursuant to the provisions of 15 U.S.C. § 1117.

91.    Defendants' willful conduct renders this case exceptional, entitling Dean to an award of its costs, expenses, and reasonable attorneys' fees incurred in bringing the present action and prior attempts to remedy Defendants' actions pursuant to 15 U.S.C. § 1117.

92.    Pursuant to 15 U.S.C. § 1118, Dean is entitled to impoundment and destruction of infringing articles.

## SECOND CLAIM FOR RELIEF

(Federal Unfair Competition & False Designation of Origin)

(15 U.S.C. § 1125(a))

93.    Dean repeats the allegations of paragraphs 1 through 74 and 76 through 87 above as if fully set forth herein.

94.    Defendants' unauthorized and infringing use of the Dean Marks in connection with Defendants' advertisement, promotion, offers for sale, and sales of its merchandise through its website and social media websites constitutes use of the Dean Marks in commerce.

95.     Defendants use the Dean Marks to confuse and deceive the public into believing that Defendants and their merchandise are sponsored, affiliated or associated with Dean, when, in fact, they are not.

96.     Defendants' unauthorized use of the Dean Marks is likely to cause confusion, mistake, and deception as to the source of the products and Defendants are unfairly benefitting from Dean's substantial efforts in advertising and promoting its Dean Marks.

97.     Defendants have actual knowledge of Dean's ownership and prior use of the Dean Marks and without the consent of Dean have and continue to willfully and intentionally violate 15 U.S.C. § 1125(a).   Upon information and belief, this is an exceptional case within the meaning of 15 U.S.C§ 1117.

98.     Defendants' actions constitute a false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

99.     Defendants' use of the Dean Marks constitutes a violation of 15 U.S.C. § 1125(a), and Dean is entitled to an injunction prohibiting such further use.

100.     Defendants' acts have caused Dean damages, and Dean seeks judgment pursuant to 15 U.S.C. § 1117 for Defendants' profits made by Defendants through their unlawful acts, for the damages sustained by Dean, and for all costs necessary to remediate the unlawful acts and their effects, pursuant to 15 U.S.C. §§ 1116 and 1117.

101.   Defendants willfully intended to trade on the recognition of Dean's famous marks, entitling Dean to treble its damages and Defendants' profits, increased subject to the principles of equity pursuant to the provisions of 15 U.S.C. § 1117.

102.   Defendants' willful conduct renders this case exceptional, entitling Dean to an award of its costs, expenses, and reasonable attorneys' fees incurred in bringing the present action and prior attempts to remedy Defendants' actions pursuant to 15 U.S.C. § 1117.

103.   Pursuant to 15 U.S.C. § 1118, Dean is entitled to impoundment and destruction of infringing articles.

## THIRD CLAIM FOR RELIEF

(Federal Trademark and Trade Dress Dilution)

(15 U.S.C. § 1125(c))

104.   Dean repeats the allegations of paragraphs 1 through 74, 76 through 87, and 94 through 98 above as if fully set forth herein.

105.   The Dean Marks are distinctive and famous marks within the meaning of 15 U.S.C. § 1125(c) by virtue of their inherent and acquired distinctiveness; the long duration and wide extent of the Dean Marks' use; the long duration, wide extent, and wide geographic reach of advertising and publicity of the Dean Marks; the large volume and wide geographic extent of sales of goods and services offered under the Dean Marks; the high degree of actual recognition of the Dean Marks; and the longstanding federal registrations of the Dean Marks.

106.    Defendants' use of the Dean Marks, or variants thereof similar to or likely to cause confusion with the Dean Marks, has been used in commerce for Defendants' commercial gain.

107.    Even if the Court finds Defendants' use of the infringing marks is not likely to cause confusion with the Dean Marks, Defendants have engaged in dilution by blurring because Defendants' use of the Dean Marks, or variants thereof similar to or likely to cause confusion with the Dean Marks, has already caused or is likely to cause an association arising from the similarity between Defendants' infringing marks and the Dean Marks that impairs the actual or acquired distinctiveness of the Dean Marks.

108.    Defendants have engaged in dilution by tarnishment because Defendants' use of the Dean Marks, or variants thereof similar to or likely to cause confusion with the Dean Marks, has already caused or is likely to cause an association arising from the similarity between Defendants' infringing uses and the Dean Marks that harms the reputation and goodwill associated with the Dean Marks.

109.    Defendants adopted use of the Dean Marks well after the Dean Marks became famous.

110.    The marks used by Defendants as illustrated above are identical to the Dean Marks.

111.    Defendants use the Dean Marks in commerce. Such use is commercial in nature.

112.    Defendants' use of the Dean Marks in connection with its online presence and associated services has caused, or is likely to cause, dilution of the Dean Marks. It is likely that the ordinary consuming public of the U.S. will make an association arising from the similarity of the marks that impairs the distinctiveness of the Dean Marks.

113.    Defendants' use of the Dean Marks constitutes dilution under 15 U.S.C. § 1125(c), and Dean is entitled to an injunction prohibiting such further use.

114.    Defendants' acts have caused Dean damages, and Dean seeks judgment pursuant to 15 U.S.C. § 1117 for Defendants' profits made by Defendants through their unlawful acts, for the damages sustained by Dean, and for all costs necessary to remediate the unlawful acts and their effects, pursuant to 15 U.S.C. §§ 1116 and 1117.

115.    Defendants willfully intended to trade on the recognition of Dean's famous marks, entitling Dean to treble its damages and Defendants' profits, increased subject to the principles of equity pursuant to the provisions of 15 U.S.C. § 1117.

116.    Defendants' willful conduct renders this case exceptional, entitling Dean to an award of its costs, expenses, and reasonable attorneys' fees incurred in bringing the present action and prior attempts to remedy Defendants' actions pursuant to 15 U.S.C. § 1117.

117.    Pursuant to 15 U.S.C. § 1118, Dean is entitled to impoundment and destruction of infringing articles.

## FOURTH CLAIM FOR RELIEF

(Florida Common Law Trademark and Trade Dress Infringement)

118.    Dean repeats the allegations of paragraphs 1 through 74, 76 through 87, and 94 through 98 above as if fully set forth herein.

119.    Dean first adopted and used the Dean Marks as a means of establishing goodwill and reputation and to describe, identify or denominate particular goods and services rendered or offered by it and to distinguish them from similar goods and services rendered or offered by others.

120.    The Dean Marks are valid and protectable marks by virtue of their association with such goods and services and Dean's federal registrations.

121.    Defendants have commenced the use of an identical or confusingly similar mark to indicate or identify closely related services.

122.    As a result, Defendants' use of the Dean Marks is likely to cause consumer confusion as to the source or as to the sponsorship of the services or goods offered or to be offered.

123.    Defendants' use of the Dean Marks is without the consent of Dean.

124.    Defendants have acted with the knowledge of the Dean Marks, and with the intent to cause confusion and/or trade on Dean's reputation and goodwill.

125.   The use by Defendants of the Dean Marks and marks incorporating the Dean Marks to identify its goods and services, as described above, constitutes infringement of Dean's rights in its marks pursuant to the common law of the State of Florida, for which infringement Dean is entitled to all remedies available to it under the common law of the State of Florida.

## FIFTH CLAIM FOR RELIEF

(Florida Trademark and Trade Dress Dilution)

126.   Dean repeats the allegations of paragraphs 1 through 74, 76 through 87, 94 through 98, 105 through 112, and  119-124 above as if fully set forth herein.

127.   The Dean Marks are distinctive and famous marks in the State of Florida within the meaning of Fla. Stat. § 495.151 by virtue of the high degree of inherent and acquired distinctiveness of the Dean Marks in this State; the long duration and wide extent of use of the Dean Marks in connection with the goods and services with which the Dean Marks are used; the long duration and wide extent of advertising and publicity of the Dean Marks in this State; the wide geographic extent of the trading area in which the Dean Marks are used; the high degree of recognition of the Dean Marks in this State in Dean's and Defendants' channels of trade; and the longstanding federal registrations of the Dean Marks.

128.   The Dean Marks have been used extensively throughout this State and this District for approximately 44 years.

129.    Defendants' use of the Dean Marks, or variants thereof similar to or likely to cause confusion with the Dean Marks, has been used in commerce for Defendants' commercial gain.

130.    Even if the Court finds Defendants' uses of the Dean Marks are not likely to cause confusion with the Dean Marks, Defendants have engaged in dilution by blurring because Defendants' use of the Dean Marks, or variants thereof similar to or likely to cause confusion with the Dean Marks, has already caused or is likely to cause an association arising from Defendants' use of the Dean Marks that impairs the actual or acquired distinctiveness of the Dean Marks.

131.    Defendants have engaged in dilution by tarnishment because Defendants' use of the Dean Marks, or variants thereof similar to or likely to cause confusion with the Dean Marks, has already caused or is likely to cause an association arising from the similarity between Defendants' infringing use and the Dean Marks that harms the reputation and goodwill associated with the Dean Marks.

132.    Defendants adopted the Dean Marks well after the Dean Marks became famous.

133.    The Defendants' use of the Dean Marks as illustrated herein is identical to the Dean Marks.

134.    Defendants use the Dean Marks in commerce. Such use is commercial in nature.

135.   Defendants' use of the Dean Marks in connection with its goods and services has caused, or is likely to cause, dilution of the Dean Marks.  It is likely that the ordinary consuming public in Florida and the Tampa area will make an association arising from use of the Dean Marks that impairs the distinctiveness of the Dean Marks.

136.   Defendants willfully intended to trade on the recognition of Dean and its famous Dean Marks.

137.   Defendants' acts have caused Dean damages, and Dean is entitled to injunctive relief and all other available statutory remedies under Fla. Stat. § 495.151, including, without limitation: Defendants' profits made by Defendants through their unlawful acts; damages sustained by Dean; for all costs necessary to remediate the unlawful acts and their effects; and for the costs, expenses, and attorney fees (as this is an exceptional case) incurred in bringing the present action and prior attempts to remedy Defendants' actions.

138.   Dean further seeks judgment for three times the amount of Defendants' profits or Dean's damages, whichever is greater, due to the nature of Defendants' conduct pursuant to Fla. Stat. §§ 495.151(2) and 495.141.

139.   Pursuant to Fla. Stat. § 495.151(2) and equity, Dean is entitled to preliminary and permanent injunctive relief against Defendants to stop the illegal conduct.

140.   Pursuant to Fla. Stat. §§ 495.151(2) and 495.141(1), Dean is entitled to impoundment and destruction of infringing articles.

## SIXTH CLAIM FOR RELIEF

(Violation of Florida Deceptive and Unfair Practices Act)

(Fla. Stat. § 501.204)

141.   Dean repeats the allegations of paragraphs 1 through 74 and 94 through 98, 119 through 124, and 127 through 136 above as if fully set forth herein.

142.   As alleged herein, Defendants' violations of the Lanham Act and Florida state and common law, including trademark infringement, unfair competition, false association and false designation of origin, and dilution, constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204, entitling Dean to all remedies available, including damages and reasonable attorneys' fees and costs.

143.   Defendants' violations of the Lanham Act and Florida state and common law, including trademark infringement, unfair competition, false association and false designation of origin, and dilution, were known by Defendants to be deceptive and misleading, or through the exercise of reasonable care or investigation could or might have been ascertained to be deceptive and misleading.

144.  Defendants' deceptive and unfair trade practices were conducted with the intent to induce others to rely upon such deceptive and unfair acts and act on them.

145.  Defendants' deceptive and unfair trade practices were conducted for the purpose of selling or disposing of personal property or services, including, without limitation, the Infringing Website and related goods and services, or to induce the public to enter into obligations relating to such property or services.

146.  Defendants' conduct has misled the consuming public concerning the nature, characteristics, and quality of Defendants' goods and services, to the consuming public's detriment and the detriment of Dean's legitimate business enterprise.

147.  Such deceptive and unfair acts offend public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

148.  Defendants' actions violate standards of unfairness and deception as set forth and interpreted by federal courts and/or violate 15 U.S.C. §§ 1114, 1125(a) and 1125(c), and Fla. Stat. § 495.151, all of which proscribe unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

149.  By these actions, Defendants have engaged and continue to engage in unfair or deceptive acts and practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* As a

result, Dean has suffered, and will continue to suffer, damage to its business, reputation, and goodwill.

150.   Dean has suffered actual damages as a direct and proximate result of Defendants' wrongful, deceptive and unfair trade practices.

151.   Defendants' deceptive and unfair trade practices are causing and will continue to cause Dean to suffer irreparable harm, for which Dean has no adequate remedy at law.

152.   Dean is entitled to injunctive relief and all other available statutory remedies, including, but not limited to, Dean's damages; Defendants' profits; and attorney fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

153.   Further, Dean is entitled to injunctive relief against Defendants to stop the illegal conduct.

## SEVENTH CLAIM FOR RELIEF

### (Florida Unfair Competition)

154.   Dean repeats the allegations of paragraphs 1 through 74, 94 through 98, and 142 through 151  above as if fully set forth herein.

155.   As alleged herein, Defendants have engaged in deceptive or fraudulent conduct, which is likely to cause, if it has not already caused, customer confusion in violation of Florida common law.

156.   Defendants' actions, as described above, constitute unfair competition under the common law of the State of Florida, in that Defendants' actions constitute Federal Trademark and Trade Dress

Infringement under the Lanham Act, False Association, False Designation of Origin, and Unfair Competition and Passing Off under the Lanham Act, Dilution under the Lanham Act, Dilution under Florida statutory law, Florida common law trademark infringement and violation of the Florida Deceptive and Unfair Trade Practices Act, entitling Dean to all remedies available under Florida law for such unfair competition.

157.   Defendants' actions are likely to cause consumers to believe that Defendants' services originate from the same source as, or are sponsored or approved by Dean, or that there is an association, affiliation, or connection between Defendants and Dean.

158.   Through Defendants' unauthorized use of the Dean Marks in connection with Defendants' goods and services in commerce, Defendants have committed trademark infringement, passing off, palming off, imitating, and/or unfair or deceptive practices that are causing or are likely to cause confusion or deception.

159.   Defendants have used in connection with their goods and services a false designation of origin, or a false or misleading description and representation of fact, which is likely to cause confusion, and to cause mistake, and to deceive as to the affiliation, connection, or association of Defendants with Dean, and to deceive as to the source, sponsorship, approval, or certification of Defendants' goods or services by Dean.

160.    Defendants' acts as alleged herein were committed with the intent to deceive and defraud the public in order to gain an increase in their sales, customer base, and share in the online merchandise industry.

161.    Defendants are liable to Dean for unfair competition under Florida law, because Defendants' conduct is tortious and has deprived Dean of customers and other prospects.

162.    Defendants' acts as alleged herein constitute unfair, deceptive, or misleading acts in violation of Florida law. Defendants' acts of unfair competition have caused Dean damages, and Dean seeks judgment for Defendants' profits made by Defendants' unfair competition, for the damages sustained by Dean, for all costs necessary to remediate the unfair competition and their effects, and for the costs incurred in bringing the present action and prior attempts to remedy Defendants' actions.

163.    Dean further seeks judgment for punitive damages of at least three times the amount of Defendants' profits or Dean's damages, whichever is greater, due to the nature of Defendants' conduct.

164.    Further, Dean is entitled to preliminary and permanent injunctive relief against Defendants to stop the illegal conduct.

## EIGHTH CLAIM FOR RELIEF

### (Breach of Contract)

165.    Dean repeats the allegations of paragraphs 1 through 74, 76 through 87, 94 through 98, 105 through 112, and 119 through 124 above as if fully set forth herein.

166.    As alleged herein, Dean and Dime's Estate had a long-standing partnership that was memorialized in the 2014 Reinstated Endorsement Agreement and Dean's earlier agreements with Dime and the Estate.

167.    As alleged herein, Dime's Estate acknowledged that it acquired no rights in Dean's trademarks and other intellectual property when it entered into the 2014 Reinstated Endorsement Agreement.

168.    As alleged herein, Dime's Estate represented and warranted that "no competing rights with respect to endorsement of guitars and stringed musical instruments or products" had been granted.

169.    As alleged herein, Dime's Estate also "agree[d] they will take all necessary steps during the Contract Period and thereafter to protect the Dime Endorsement, the name 'Dime,' or any facsimile thereof."

170.    Dime's Estate – Haney is selling merchandise bearing Dean's trademarks and intellectual property.

171.    Sales of merchandise bearing Dean's trademarks and intellectual property is in violation of and contrary to Dime's Estate – Haney's obligations and agreements under the 2014 Reinstated Endorsement Agreement and constitutes a breach of the 2014 Reinstated Endorsement Agreement.

172.    Dean has complied with its obligations under the terms of the 2014 Reinstated Endorsement Agreement, including by continuing to make monthly payments to Dime's Estate – Haney up to and including August 2021, and thus establishing a course of dealing and a course of performance.

173.   Dean has been and continues to be damaged by Dime's Estate – Haney's breach of contract.

174.   Dean requests damages for such breach of contract and specific performance of the contract to prevent further breach of the acknowledgment that Dime's Estate – Haney acquired no rights in Dean's trademarks and other intellectual property when it entered into the 2014 Reinstated Endorsement Agreement.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Dean hereby requests a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Dean respectfully demands a jury trial and requests the Court to award Dean the following relief:

A.   That the Court render a final judgment in favor of Dean and against Defendants on all claims for relief herein;

B.   That Defendants be adjudged to have infringed and diluted Dean's rights in and to its federally registered and common law Dean Marks and trade dress;

C.   That the Court render a final judgment declaring Defendants have willfully violated the provisions of 15 U.S.C. § 1125(a) by infringing Dean's rights in the Dean Marks;

D.     That the Court render a final judgment declaring that Defendants have violated Florida law by unfairly competing with Dean and that Defendants' actions were done willfully and knowingly;

E.     That Defendants, its officers, principals, agents, servants, employees, attorneys, successors, and assigns and all other persons in active concert or participation with any of them who receive actual notice of the injunction by personal service or otherwise, be forthwith permanently enjoined from:

1.     using the Dean Marks, or any other mark, symbol, or design that is confusingly similar to the Dean Marks on or in connection with their merchandise

2.     filing any applications for registration of any trademarks confusingly similar to the Dean Marks;

3.     falsely designating the origin of Defendants' goods;

4.     unfairly competing with Dean in any manner whatsoever;

5.     causing a likelihood of confusion or injury to Dean's business reputation; and

6.     manufacturing, using, displaying, distributing, or selling any goods that infringe the Dean Marks;

F.     That Defendants be required to account to Dean for any and all profits derived by Defendants and all damages sustained by Dean by virtue

of Defendants' actions complained of herein, and that such profits and damages be trebled;

G.       That Defendants be ordered to pay over to Dean all damages Dean has sustained as a consequence of the acts complained of herein, subject to proof at trial;

H.       That Dean be awarded damages pursuant to 15 U.S.C. § 1117, together with prejudgment and post-judgment interest;

I.       That Defendants' actions be deemed willful and that this case be deemed exceptional and the amount of damages be trebled and that the amount of profits be increased by as many times as the Court deems appropriate, pursuant to 15 U.S.C. § 1117;

J.       That Defendants be ordered to pay punitive damages;

K.       That an award of reasonable costs, expenses, and attorneys' fees be awarded to Dean pursuant to 15 U.S.C. § 1117;

L.       An accounting of damages and other remedies from the time of trial to judgment; and

M.       Such other and further relief as this Court may deem just.

PETERSON & MYERS, P.A.

Dated:  August 20, 2021        By: /s/ Stephen R. Senn
                               Florida Bar No. 0833878
                               srsenn@petersonmyers.com

Dated:  August 20, 2021        By: /s/ Nicholas L. Sellars
                               Florida Bar No. 0119379

nsellars@petersonmyers.com
Post Office Box 24628
Lakeland, FL 33802-4628
Telephone: (863) 863-6511

FISH & RICHARDSON P.C.

Dated: August 20, 2021

By: /s/ Christopher S. Marchese

Christopher S. Marchese (motion for special admission pending)
California Bar No. 170239
marchese@fr.com
Tim Rawson (motion for special admission pending)
California Bar No. 304755
rawson@fr.com
12860 El Camino Real Ste. 400
San Diego, CA 92130
Telephone: (858) 678-5070

Thomas Halkowski (motion for special admission pending)
DC Bar No. 473300
halkowski@fr.com
1000 Maine Ave. SW
Washington, DC 20024
Telephone: (202) 783-5070

Attorneys for Plaintiffs
ARMADILLO DISTRIBUTION
ENTERPRISES, INC. D/B/A DEAN
GUITARS; CONCORDIA INVESTMENT
PARTNERS, LLC